JAMES L. MEEDER (BAR NO. 62114)
KAMRAN JAVANDEL (BAR NO. 272900)
ALLEN MATKINS LECK GAMBLE
  MALLORY & NATSIS LLP
Three Embarcadero Center, 12th Floor
San Francisco, CA  94111-4074
Phone: (415) 837-1515
Fax:  (415) 837-1516
E-Mail:  jmeeder@allenmatkins.com

EMILY L. MURRAY (BAR NO. 223815)
ALLEN MATKINS LECK GAMBLE
  MALLORY & NATSIS LLP
515 South Figueroa Street, Ninth Floor
Los Angeles, California 90071-3309
Phone: (213) 622-5555
Fax:  (213) 620-8816
E-Mail:  emurray@allenmatkins.com

Attorneys for Defendant
HVI CAT CANYON, INC., f/k/a GREKA OIL &
GAS, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* CALIFORNIA DEPARTMENT OF FISH AND GAME and CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, CENTRAL COAST REGION,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>HVI CAT CANYON, INC., f/d/a GREKA OIL & GAS, INC.,<br><br>                    Defendant. | Case No. CV 11-05097 FMO (RZx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HVI CAT CANYON, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:      October 23, 2014<br>Time:     10:00 a.m.<br>Ctrm:     22 - 5th Floor<br>Judge:   Hon. Fernando M. Olguin<br><br>Complaint Filed:  June 17, 2011 |

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

937297.03/SF

Case No.  CV 11-05097 FMO (RZx)
MEMORANDUM OF POINTS AND
AUTHORITIES

# **TABLE OF CONTENTS**

**Page**

I.    Introduction ................................................................................................. 1

II.   The Motion Directed at the US Claims ...................................................... 2

    A.    Overview ............................................................................................ 2

    B.    The Material Allegations in the FAC ................................................ 3

        1.    The Three Surface Features at Issue ......................................... 3

        2.    The Other Surface Features Identified in the FAC ................... 5

    C.    The Undisputed Material Facts ......................................................... 5

        1.    Relevant Facts Re Alleged Water Impacts ............................... 5

        2.    Relevant Facts Re Alleged "Adjoining Shoreline" Impacts ..................................................................................... 6

    D.    Argument ........................................................................................... 7

        1.    The Seven Spills Did Not Impact Water................................... 7

        2.    The Seven Spills Did Not Impact "Adjoining Shorelines" ............................................................................... 8

            (a)    The Meaning of the Phrase "Adjoining Shorelines" ..................................................................... 10

            (b)    The Legislative History of "Adjoining Shorelines" ..................................................................... 11

                (i)    Its Original Use (1966-1970) ............................. 12

                (ii)    Its Current Use (1970-Present)........................... 12

III.  The Motion Directed at the Regional Board Claims .................................. 16

    A.    Overview ......................................................................................... 16

    B.    The Material Allegations in the FAC .............................................. 17

    C.    The Undisputed Material Facts ....................................................... 17

    D.    Argument ......................................................................................... 18

        1.    The Six 13350 Spills Should be Dismissed Because They Did Not Involve a Discharge to "Surface Water or Groundwater" ......................................................... 18

        2.    The Regional Board's Volume-Based Penalty Claims in the Seventh Claim Should be Dismissed

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

937297.03/SF

(i)

Case No.  CV 11-05097 FMO (RZx)
MEMORANDUM OF POINTS AND
AUTHORITIES

**Page**

Because Each the Section 13385 Spills Was
Cleaned Up ............................................................................................. 20

IV.    Conclusion ........................................................................................................... 23

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

937297.03/SF

(ii)

Case No.  CV 11-05097 FMO (RZx)
MEMORANDUM OF POINTS AND
AUTHORITIES

# **TABLE OF AUTHORITIES**

**Page**

## **Cases**

*Carter v. Smith Food King,*
  765 F.2d 916 (9th Cir. 1985) .................................................................. 22, 23

*City of Long Beach v. Mansell,*
  3 Cal.3d 462 (1970) .................................................................................. 21

*Davis v. Lukhard,*
  788 F.2d 973 (4th Cir. 1986) ................................................................... 15

*Demby v Schweiker,*
  671 F.2d 507 (D.C. Cir. 1981)................................................................. 15

*Donovan v. Anheuser-Busch, Inc.,*
  666 F.2d 315 (8th Cir. 1981) ............................................................... 9, 11

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr.*
  *Trades Council,*
  485 U.S. 568, 108 S. Ct. 1392, 99 L. Ed. 2d 645 (1988) ....................... 10

*FDIC v. Meyer,*
  510 U.S. 471, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994)......................... 8, 19

*Hunt v. Superior Court,*
  21 Cal.4th 984 (1999) ............................................................................. 19

*Maitland v. Univ. of Minnesota,*
  43 F.3d 357 (8th Cir. 1994) .................................................................... 21

*Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc.,*
  568 F.Supp.2d 1152 (C.D. Cal. 2008) .................................................... 21

*Nisan Fire & Marine Insurance Company, LTD, et al. v. Fritz*
  *Companies, Inc.,*
  210 F.3d 1099 (9th Cir. 2000) ...................................................................2

*NLRB v. Catholic Bishop of Chicago,*
  440 U.S. 490, 99 S. Ct. 1313, 59 L. Ed. 2d 533 (1979) .......................... 10

*Perrin v. United States,*
  444 US 37, 62 L.Ed.2d 199, 100 S.Ct. 311 (1979)...................................9

*Radobenko v. Automated Equipment Corporation,*
  520 F.2d 540 (9th Cir. 1975) ....................................................................1

*Ruecker v. Sommer,*
  567 F. Supp. 2d 1276 (D. Or. 2008) ........................................................ 21

*Russell Motor Car Co. v. United States,*
  261 U.S. 514, 43 S.Ct. 428, 67 L.Ed. 778 (1923)................................. 9, 11

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

Case No.  CV 11-05097 FMO (RZx)
MEMORANDUM OF POINTS AND
AUTHORITIES

*Sawyer v. Sonoma County,*
　　719 F.2d 1001 (9th Cir. 1983) ........................................................ 21

*Solid Waste Agency of N. Cook County v. U. S. Army Corps of
　　Engineers,*
　　531 U.S. 159, 121 S. Ct. 675, 148 L. Ed. 2d 576 (2001) ........................ 10

*US v. Stauffer Chemical Company,*
　　684 F.2d. 1174 (6th Cir. 1982) ....................................................... 9

*Wunderlich v. State of California,*
　　65 Cal.2d 777 (1967) .......................................................... 22, 23

**Statutes**

33 U.S.C. § 1251 *et seq.* .................................................................. 2

33 U.S.C. § 1321(b)(3) ............................................................. 4, 11

33 U.S.C. § 1322(7) ........................................................................ 4

33 U.S.C. § 2702(a) ........................................................................ 2

33 U.S.C. §1311 ........................................................................... 14

33 U.S.C. §1311(a) ....................................................................... 14

33 U.S.C. §1319(a) ......................................................................... 2

33 U.S.C. §1319(b) ......................................................................... 2

33 U.S.C. §1321 ..................................................................... 12, 14

33 U.S.C. §1321(a)(1) ................................................................. 2, 3

33 U.S.C. §1321(b)(3) ............................... 2, 3, 7, 8, 11, 12, 16

33 U.S.C. §1321(b)(4) ..................................................................... 3

33 U.S.C. §1321(b)(7) ..................................................................... 2

33 U.S.C. §1362(11) ....................................................................... 2

33 U.S.C. §1362(7) ....................................................................... 14

33 U.S.C. §311(b)(3) ....................................................................... 4

33 U.S.C. §3121(b)(3) .............................................................. 8, 16

Cal. Evid. Code § 623 .................................................................... 21

Cal. Gov Code §§ 8670.4, *et seq.* ................................................... 22

Cal. Wat. Code § 13050(e) .............................................................. 18

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

937297.03/SF

(ii)

Case No.  CV 11-05097 FMO (RZx)
MEMORANDUM OF POINTS AND
AUTHORITIES

Cal. Wat. Code § 13304 ........................................................................ 19

Cal. Wat. Code § 13350 ................................................................ 17, 19, 20

Cal. Wat. Code § 13350(a)....................................................... 16, 17, 18, 19

Cal. Wat. Code § 13350(a)(3) ............................................................... 19

Cal. Wat. Code § 13350(a)(5) ............................................................... 17

Cal. Wat. Code § 13385 ................................................................ 17, 18, 20

Cal. Wat. Code § 13385(b)(1) ............................................................... 20

Cal. Wat. Code § 13385(b)(1)(B) ................................................... 17, 20, 23

Cal. Wat. Code § 13385(g) ................................................................... 20

Pub. L. No. 288, 43 Stat. 604................................................................ 12

Pub. L. No. 89-753, 80 Stat. 1246 (1966)............................................. 12

Pub. L. No. 89-753, 80 Stat. 1253 (1966)............................................. 12

Pub. L. No. 910224, § 11, 84 Stat. 91, 91-98 ..................................... 14

Pub. L. No. 91-224, 84 Stat. 91........................................................... 12

Pub. L. No. 91-224, 84 Stat. 92........................................................... 13

Pub. L. No. 92-500, § 311, 86 Stat. 816, 844-846 .............................. 14

Pub. L. No. 92-500, 86 Stat. 816......................................................... 14

Pub. L. No. 95-576, 92 Stat. 2467, 2468 (1978) ................................. 13

**Other Authorities**

116 Cong. Rec. 8983, 8985 (1970)....................................................... 13

H.R. Rep. No. 91-940, at 37 (1970) (Conf. Rep.)................................ 12

H.R. Rep. No. 92-911, at 117 (1972).................................................. 15

http:en.wikipedia.org/wiki/Shoreline.................................................. 10

S. Rep. No. 91-351, at 3 and 6 (1969) ................................................ 13

S. Rep. No. 92-1236, at 132-133 (1972) (Conf. Rep.)......................... 15

S. Rep. No. 92-414, at 65-66 (1971).................................................... 14

U.S. EPA Letter, October 11, 1972, *reprinted in* A Legislative History
    of the Water Pollution Control Act Amendments of 1972, Vol. 1,

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

937297.03/SF

Case No.  CV 11-05097 FMO (RZx)
MEMORANDUM OF POINTS AND
AUTHORITIES

at 143-158 ................................................................................ 15

## Rules

Fed. R. Civ. P. 56 ...................................................................... 1

## Treatises

Merriam-Webster's Collegiate Dictionary (10th ed. 1999)....................................... 19

Merriam-Webster's Collegiate Dictionary (11th ed.), at 1151................................ 10

Merriam-Webster's Collegiate Dictionary (11th ed.), at 16.................................... 11

The American Heritage Dictionary, Second College Edition (1991), at
1132........................................................................................ 10, 11

Webster's Third New International Dictionary (Unabridged) (1986)................ 10, 11

## Regulations

33 C.F.R. § 328(a)(1) ................................................................... 6

40 C.F.R. § 110.1 ....................................................................... 3

40 C.F.R. § 110.3(b)........................................................ 2, 3, 7, 8, 11, 16

40 C.F.R. §§ 300.110, *et seq.* .......................................................... 22

40 C.F.R. Part 110......................................................................... 3

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

937297.03/SF

(iv)

Case No.  CV 11-05097 FMO (RZx)
MEMORANDUM OF POINTS AND
AUTHORITIES

# I.   Introduction

This action was filed on June 17, 2011, by three plaintiffs: the United States of America ("US"), the California Department of Fish & Wildlife ("CDFW"), and the California Regional Water Quality Control Board, Central Coast Region ("Regional Board").  (Collectively CDFW and the Regional Board are referred to herein as the "State" and the US and State are referred to herein as the "Plaintiffs.") In response, the sole defendant, HVI Cat Canyon, Inc. ("HVI-CC"), which owns and operates oil production and exploration facilities in Santa Maria, California, filed a Rule 12 motion to dismiss certain claims on jurisdictional grounds.  (Docket # 6.) On June 12, 2012, the motion was denied.  (Docket # 26.)  On February 28, 2013, Plaintiffs filed a First Amended Complaint ("FAC"), containing ten Claims for Relief ("Claims").  (Docket # 56.)  The US brings Claims One through Five under the federal Clean Water Act and Oil Pollution Act.  The Regional Board brings Claims Six and Seven under the California Water Code, and CDFW brings Claims Eight through Ten under the California Fish and Game Code.

For most of 2013, discovery was stayed to allow the Parties, with the aid of a mediator, to resolve this action by settlement.  (Docket # 59, 65, 67.)  That effort failed.  On January 23, 2014, the discovery stay expired.   (Docket # 67.)  Fact discovery closes on December 19, 2014, and expert discovery begins February 6, 2015, and closes May 22, 2015.  (Docket # 77.)  The trial, which will require the testimony of multiple experts, is set to commence December 7, 2015.  (*Id.*)

HVI-CC seeks, by this Rule 56 motion for partial summary judgment, "to separate real and genuine issues from those that are formal or pretended, so that only the former may subject [it] to the burden of trial." *Radobenko v. Automated Equipment Corporation*, 520 F.2d 540, 544 (9th Cir. 1975).[1]

---

[1] Fed. R. Civ. P. 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Nisan Fire &*

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

Case No. CV 11-05097 FMO (RZx)
MEMORANDUM OF POINTS AND
AUTHORITIES

## II.    The Motion Directed at the US Claims

### A.    Overview

The US alleges that, between 2005 and 2010, HVI-CC discharged oil on 12 occasions at its Santa Maria facilities in violation of: (1) Section 311(b)(3) of the Clean Water Act ("CWA"), 33 U.S.C. §1321(b)(3),[2] which prohibits the discharge of oil (First Claim); and (2) Section 1319(a), which makes it unlawful to discharge a pollutant without a permit (Second Claim).  The US alleges that each discharge is a separate violation of the CWA for which it seeks: (1) unspecified civil penalties under Section 1321(b)(7); (2) unspecified injunctive relief under Section 1319(b), and (3) cost recovery of under Section 1002(a) of the Oil Pollution Act, 33 U.S.C. § 2702(a).  (*See* First through Fifth Claims in the FAC.)

Section 1321(b)(3) prohibits "[t]he discharge of oil or hazardous substances … into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone ... in such quantities as may be harmful as determined by the President…."  The word "oil" is defined in Section 1321(a)(1) to mean "oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge, refuse, and oil mixed with wastes other than dredged spoil."  The terms "navigable waters of the United States" and "adjoining shorelines" are not defined in the CWA.  The term "navigable waters," which appears elsewhere in the statute, is ambiguously defined in Section 1362(11) to mean "the waters of the United States, including the territorial seas."

The term "quantities which may be harmful" is defined, in pertinent part as framed by the FAC, at 40 C.F.R. § 110.3(b), as those discharges of oil that "[c]ause a film or sheen upon or discoloration of the surface of the water or adjoining

---

[2] *Marine Insurance Company, LTD, et al. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000).
All references to "Section ___" in this Section II of this brief are to a section of the Clean Water Act codified in 33 U.S.C. § 1251 *et seq.*, unless otherwise indicated.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

937297.03/SF

-2-

Case No.  CV 11-05097 FMO (RZx)
MEMORANDUM OF POINTS AND
AUTHORITIES

1  shorelines or cause a sludge or emulsion to be deposited beneath the surface of the

2  water or upon adjoining shorelines."[3]  A "sheen" is defined at 40 C.F.R. § 110.1 to

3  mean "an iridescent appearance on the surface of water."  The regulation does not

4  define the term "adjoining shorelines."  Thus, to establish that HVI-CC violated

5  Section 1321(b)(3), the US must prove that the Seven Spills involved (1) a discharge

6  of oil as defined in Section 1321(a)(1), (2) into or upon the navigable waters of the

7  United States or adjoining shorelines within the meaning of Section 1321(b)(3), and

8  (3) in such quantities which "may be harmful" as defined in 40 C.F.R. § 110.3(b).

9       Because at the time of this motion there are factual issues, which may require

10  expert testimony, regarding: (1) whether "produced water" is "oil" within the

11  meaning of Section 1321(a)(1); (2) the volume of oil discharged; and (3) whether oil

12  was discharged into or upon "navigable waters of the United States" within the

13  meaning of Section 1321(b)(3), this motion addresses only the question of whether

14  each of the Seven Spills involved the discharge of oil in such quantities as "may be

15  harmful" as defined in 40 C.F.R. § 110.3(b).

16       Specifically, HVI-CC seeks partial judgment dismissing seven of the 12 spills

17  ("Seven Spills") from the First Claim because the US cannot produce admissible

18  evidence of an essential element of the alleged violation of Section 1321(b)(3),

19  namely, that the Seven Spills caused a film or sheen upon or discoloration of the

20  surface of the water or adjoining shorelines, or a sludge or emulsion to be deposited

21  beneath the surface of the water or upon adjoining shorelines.

22       **B.   The Material Allegations in the FAC**

23            **1.   The Three Surface Features at Issue**

24       The US alleges that HVI-CC spilled crude oil and produced water at its Bell

25  oil production facility: (1) on June 8, 2005, July 13, 2005, July 16, 2007, and

26

27  [3]  Under § 1321(b)(4), the President was authorized to define the term "quantities
       which may be harmful."  By Executive Order 11735, published at 38 Fed. Reg.
28     21341, 21243 (August 7, 1973), the President delegated his authority under
       § 1321(b)(4) to the U.S. EPA, which promulgated 40 C.F.R. Part 110.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

937297.03/SF

Case No.  CV 11-05097 FMO (RZx)
MEMORANDUM OF POINTS AND
AUTHORITIES

1   October 14, 2010, which "reached an unnamed tributary to Sisquoc Creek that runs

2   along Palmer Road ('Palmer Road Creek') and its adjoining shorelines" (the "Four

3   Palmer Road Spills"); (2) on August 11, 2005, which "reached Cat Canyon Creek

4   and its adjoining shorelines" (the "Cat Canyon Spill"); and (3) on December 27,

5   2008, and May 1, 2009, which "reached an unnamed tributary that Plaintiffs refer to

6   as 'Spring Canyon Tributary' and its adjoining shorelines" (the "Two Spring Canyon

7   Spills"). (FAC ¶¶ 92, 105, 107, and 109.) (Collectively the Four Palmer Road

8   Spills, the Cat Canyon Spill, and the Two Spring Canyon Spills are referred to

9   herein as the "Seven Spills.")

10        The US further alleges that the so-called "Palmer Road Creek," Cat Canyon

11   Creek, and the so-called "Spring Canyon Tributary" are "'navigable waters' within

12   the meaning of Section 311(b)(3) and 502(7) of the CWA, 33 U.S.C. §§ 1321(b)(3)

13   and 1362(7);" and that each of the Seven Spills discharged "oil into or upon the

14   navigable waters of the United States or adjoining shorelines within the meaning of

15   Section 311(b)(3)." (*Id.* ¶¶ 123, 124.)

16        With regard to the third element of Section 1321(b)(3), the focus of the

17   present motion, the US alleges that:

18        (1) the Four Palmer Road Spills were "of such a quantity as to cause a film or

19   sheen upon, or discoloration of, Palmer Road Creek or upon adjoining shorelines, or

20   to cause a sludge or emulsion to be deposited into Palmer Road Creek or upon

21   adjoining shorelines," (*id.* ¶¶ 93, 106);

22        (2) the Cat Canyon Spill "was of such a quantity as to cause a film or sheen

23   upon, or discoloration of, Cat Canyon Creek or upon adjoining shorelines, or to

24   cause a sludge or emulsion to be deposited into Cat Canyon Creek or upon adjoining

25   shorelines," (*id.* ¶ 107), and

26        (3) the Two Spring Canyon Spills were "of such a quantity as to cause a film

27   or sheen upon, or discoloration of, Spring Canyon Tributary or upon adjoining

28

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

937297.03/SF

Case No.  CV 11-05097 FMO (RZx)
MEMORANDUM OF POINTS AND
AUTHORITIES

-4-

1  shorelines, or to cause a sludge or emulsion to be deposited into Spring Canyon

2  Tributary or upon adjoining shorelines," (*id.* ¶ 110).

3           **2.     The Other Surface Features Identified in the FAC**

4           In the FAC, the US identifies a number of other surface features which it

5  alleges are connected as tributaries to the so-called "Palmer Road Creek," Cat

6  Canyon Creek, and the so-called "Spring Canyon Tributary."

7           Specifically, the US alleges that: (1) the so-called "Palmer Road Creek" is a

8  "tributary to the Sisquoc Creek," which is "a tributary to Cat Canyon Creek;" (*id.*

9  ¶ 120); (2) the so-called "Spring Canyon Tributary" is "an unnamed tributary" to "an

10 unnamed tributary to Cat Canyon Creek that runs generally parallel to Spring

11 Canyon Road and that Plaintiffs refer to as 'Spring Canyon Creek,'" which is a

12 tributary to Cat Canyon Creek, (*id.*, ¶ 109); and (3) "Cat Canyon Creek" is "a

13 tributary to the Sisquoc River," which is "a tributary to the Santa Maria River,"

14 which is "a tributary to the Santa Maria River Estuary, a traditionally navigable

15 water that flows into the Pacific Ocean," (*id.,* ¶ 120).

16          The US does not allege that crude oil or produced water discharged during the

17 Seven Spills reached any of these surface features.  (FAC, *passim.*)

18      **C.     The Undisputed Material Facts**

19           **1.     Relevant Facts Re Alleged Water Impacts**

20          In its discovery responses, the US admits, with regard to the Four Palmer

21 Road Spills, that "[a]fter reasonable inquiry, the information the United States

22 knows or can readily obtain is insufficient to enable it to admit or deny" that the

23 spills "did not cause a film or sheen upon, or discoloration of the surface of water in

24 the Palmer Road Creek or cause a sludge or emulsion to be deposited beneath the

25 surface of water in the Palmer Road Creek."  (Separate Statement of Undisputed

26 Material Facts ("SSUF") ¶¶ 1-4.)

27          In response to a request to admit that the so-called "Palmer Road Creek" did

28 not contain water during the Four Palmer Road Spills, the US admits that "at the

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

937297.03/SF

-5-

Case No.  CV 11-05097 FMO (RZx)
MEMORANDUM OF POINTS AND
AUTHORITIES

1    time of [each spill], water was not flowing in that portion of Palmer Road Creek

2    where crude oil discharged during the spill came to be located.  Otherwise, after

3    reasonable inquiry, the information the United States knows or can readily obtain is

4    insufficient to enable it to admit or deny the Request." (*Id.* ¶¶ 5-8.)

5           The US makes the same admissions with regard to the Cat Canyon Spill and

6    the Two Spring Canyon Spills.  (*Id.* ¶¶ 9-14.)

7           Contemporaneous records generated by one or more of the Plaintiffs and/or

8    Santa Barbara County report that at the time of the Seven Spills the so-called

9    "Palmer Road Creek," Cat Canyon Creek, and so-called "Spring Canyon Tributary"

10   were dry and the spills were promptly cleaned up.  (*Id.* ¶¶ 15-28.)

11          **2.    Relevant Facts Re Alleged "Adjoining Shoreline" Impacts**

12          In its discovery responses, the US admits that the so-called "Palmer Road

13   Creek" and Cat Canyon Creek are not "traditional navigable water[s] within the

14   meaning of 33 C.F.R. § 328(a)(1)."  (SSUF ¶¶ 29-30.)  With regard to the so-called

15   "Spring Canyon Tributary," the US alleges in the FAC that the so-called "Spring

16   Canyon Tributary" is "an unnamed tributary" to "an unnamed tributary to Cat

17   Canyon Creek" (FAC, ¶ 109), which the US admits in not a traditional navigable

18   water within the meaning of 33 C.F.R. § 328(a)(1).  Section 328(a)(1) of Title 33 of

19   the Code of Federal Regulations provides: "The term *waters of the United States*

20   means (1) [a]ll waters which are currently used, or were used in the past, or may be

21   susceptible to use in interstate or foreign commence, including all waters which are

22   subject to the ebb and flow of the tide."

23          Thus, the US cannot produce admissible evidence that the so-called "Palmer

24   Road Creek," Cat Canyon Creek, or the so-called "Spring Canyon Tributary" are

25   surface features which ever contained or could contain sufficient water (1) to render

26   them navigable in fact, (2) to have been used in interstate or foreign commerce, or

27   (3) to be susceptible to use in interstate or foreign commerce.

28

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

937297.03/SF

-6-

Case No.  CV 11-05097 FMO (RZx)
MEMORANDUM OF POINTS AND
AUTHORITIES

**D.     Argument**

In order to establish the "may be harmful" element of Section 1321(b)(3), the US must prove, as required by 40 C.F.R. § 110.3(b), that each of the Seven Spills involved such a quantity of oil so as to "[c]ause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines or cause a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines."

### 1.     The Seven Spills Did Not Impact Water

The US does not allege, nor, given the undisputed material facts could it produce admissible evidence, that each of the Seven Spills was of such a quantity as to "[c]ause a film or sheen upon or discoloration of *the surface of the water* … or cause a sludge or emulsion to be deposited beneath *the surface of the water*…" as required by 40 C.F.R. § 110.3(b).  (Emphasis added.)  Rather, the US alleges only that the oil discharged "was of such a quantity as to cause a film or sheen upon, or discoloration of, *Palmer Road Creek[, Cat Canyon Creek, and Spring Canyon Tributary]* … , or to cause a sludge or emulsion to be deposited into *Palmer Road Creek[, Cat Canyon Creek, and Spring Canyon Tributary]*…."  (Section II.B.1., above, at page 4; Emphasis added.)

Such allegations are insufficient as a matter of law.  The plain words of 40 C.F.R. § 110.3(b) require the discharge to have caused a film or sheen upon, discoloration of, or a sludge or emulsion to be deposited beneath *the surface of the water*.

It is undisputed that at the time of each of the Seven Spills the so-called "Palmer Road Creek," Cat Canyon Creek, and the so-called "Spring Canyon Tributary" were dry and did not contain water.  (Section II.C.1., above, at pages 5-6.)  It is undisputed that the Seven Spills were promptly cleaned up.  (*Id.*)  And, after multiple years to investigate and discover the facts, the US admits that it does not have sufficient information to enable it to admit or deny that the Seven Spills

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

937297.03/SF

-7-

Case No.  CV 11-05097 FMO (RZx)
MEMORANDUM OF POINTS AND
AUTHORITIES

1    "did not cause a film or sheen upon, or discoloration of *the surface of water* in the

2    Palmer Road Creek[, Cat Canyon Creek, or Spring Canyon Tributary] or cause a

3    sludge or emulsion to be deposited beneath *the surface of water* in the Palmer Road

4    Creek[, Cat Canyon Creek, or Spring Canyon Tributary]." (*Id.*, Emphasis added.)

5        Thus, the US cannot present admissible evidence that the Seven Spills

6    discharged oil into the so-called "Palmer Road Creek," Cat Canyon Creek, or the so-

7    called "Spring Canyon Tributary" in a quantity which may be harmful within the

8    meaning of 40 C.F.R. § 110.3(b).  Accordingly, HVI-CC is entitled to a partial

9    judgment dismissing each of the allegations in the First Claim that the Seven Spills

10   discharged oil into or upon the so-called "Palmer Road Creek," Cat Canyon Creek,

11   or the so-called "Spring Canyon Tributary" in violation of Section 3121(b)(3).

12       **2.**      **The Seven Spills Did Not Impact "Adjoining Shorelines"**

13        To establish that each of the Seven Spills discharged oil in a quantity that

14   "may be harmful" to "adjoining shorelines," the US must prove at trial that: (1) the

15   so-called "Palmer Road Creek," Cat Canyon Creek, and the so-called "Spring

16   Canyon Tributary" are surface features which have "adjoining shorelines" within the

17   meaning of Section 1321(b)(3); and (2) each of the Seven Spills caused a film or

18   sheen upon or discoloration of those adjoining shorelines or cause a sludge or

19   emulsion to be deposited upon those adjoining shorelines.

20        The CWA and its regulations do not define the phrase "adjoining shorelines."

21   Nor has HVI-CC been able to locate any case law which defines the term "adjoining

22   shorelines."  Given that the phrase has no statutory definition, the following rules

23   govern its meaning.

24        In the absence of a statutory definition, courts construe statutory words and

25   terms in accordance with their ordinary, common, or natural meaning. *FDIC v.*

26   *Meyer*, 510 U.S. 471, 476, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994) ("In the absence

27   of [a statutory] definition, we construe a statutory term in accordance with its

28   ordinary or natural meaning"); *Perrin v. United States*, 444 US 37, 42, 62 L.Ed.2d

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

937297.03/SF

-8-

Case No.  CV 11-05097 FMO (RZx)
MEMORANDUM OF POINTS AND
AUTHORITIES

1  199, 100 S.Ct. 311 (1979) ("A fundamental canon of statutory construction is that,

2  unless otherwise defined, words will be interpreted as taking their ordinary,

3  contemporary, common meaning.")

4      If the ordinary, common, and natural meaning of an undefined statutory word

5  or term is unambiguous, the maxims of statutory construction, such as *noscitur a*

6  *sociis* (a word is known by the company it keeps) or *ejusdem generis* (where

7  specific words follow general words, the specific words restrict application of the

8  general terms to things that are similar to those enumerated), may not be applied to

9  alter the accepted meaning. *Donovan v. Anheuser-Busch, Inc.*, 666 F.2d 315, 327

10  (8th Cir. 1981) ("These maxims [*noscitur a sociis* and *ejusdem generis*] are only

11  aids to judicial interpretation, and they will not be applied [1] when there is no

12  ambiguity, [2] to defeat the legislative intent or purpose, [3] to make general words

13  meaningless, or [4] to reach a conclusion inconsistent with other rules of

14  construction."); *Russell Motor Car Co. v. United States*, 261 U.S. 514, 519, 43 S.Ct.

15  428, 67 L.Ed. 778 (1923) ("Rules of statutory construction are to be invoked as aids

16  to the ascertainment of the meaning or application of words otherwise obscure or

17  doubtful. They have no place, as this Court has many times held, except in the

18  domain of ambiguity." … They may not be used to create doubt but only to remove

19  doubt.")

20      If the legislative history of a statutory word or term suggests that Congress

21  intended it to have a meaning different than its ordinary, common, and natural

22  meaning, courts will consider that history. *US v. Stauffer Chemical Company*, 684

23  F.2d. 1174, 1183 (6th Cir. 1982) (holding that "the plain meaning of statutory

24  language is not always decisive…. This is especially true when the legislative

25  history suggests a different interpretation.") However, where a construction of a

26  statutory word or phrase implicates the constitutional authority of Congress, before

27  sanctioning such authority, "there must be present the affirmative intention of the

28  Congress clearly expressed." *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490,

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

937297.03/SF

-9-

Case No. CV 11-05097 FMO (RZx)
MEMORANDUM OF POINTS AND
AUTHORITIES

1   500-501, 99 S. Ct. 1313, 59 L. Ed. 2d 533 (1979); *Solid Waste Agency of N. Cook*

2   *County v. U. S. Army Corps of Engineers*, 531 U.S. 159, 172-173, 121 S. Ct. 675,

3   148 L. Ed. 2d 576 (2001) ("*SWANCC*"), (Applying the *Catholic Bishop* rule, the

4   Court invalidated the Army Corps of Engineers' "Migratory Bird Rule," which

5   attempted, under the CWA, to regulate isolated ponds and mudflats not immediately

6   adjacent to open waters.)[4]

7       With these rules in mind, we begin with the ordinary, common, and natural

8   meaning of the term "adjoining shorelines."

9                   **(a)    The Meaning of the Phrase "Adjoining Shorelines"**

10      The ordinary and common meaning of the word "shore" is "the land bordering

11  a usu. [usually] large body of water; specif. [specifically]: Coast."  Merriam-

12  Webster's Collegiate Dictionary (11th ed.), at 1151; Webster's Third New

13  International Dictionary (Unabridged) (1986) (Same).  The word "shoreline" means

14  "the line where a body of water and the shore meet."  *Id*.  The American Heritage

15  Dictionary, Second College Edition (1991), at 1132, defines the word "shore" as

16  "[t]he land along the edge of an ocean, sea, lake or river," and "shoreline" as "[t]he

17  line marking the edge of a body of water."  *Id*.

18      Wikipedia provides this explanation of the common usage of the words

19  "shore" and "shoreline": "A **shore** or **shoreline** is the fringe of land at the edge of a

20  large body of water, such as an ocean, sea, or lake.…  In contrast to a coast, a shore

21  can boarder any body of water, while the coast must boarder an ocean; that is the

22  coast is a type of shore.  The word shore is often substituted for coast where oceanic

23  shore is meant."  http:en.wikipedia.org/wiki/Shoreline.  The word "adjoining" is

24  defined as "touching or bordering at a point or line."  Merriam-Webster's Collegiate

25

26

27

---

28  [4]   In *SWANCC*, 531 U.S. at 173, the Court relied on *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council*, 485 U.S. 568, 575, 108 S. Ct. 1392, 99 L. Ed. 2d 645 (1988), which relied on *Catholic Bishop*.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

937297.03/SF                                                                          -10-

Case No.  CV 11-05097 FMO (RZx)
MEMORANDUM OF POINTS AND
AUTHORITIES

1  Dictionary *supra*, at 16; Webster's Third New International Dictionary, *supra*,

2  (Same); and American Heritage Dictionary, *supra*, (Same).

3      In short, the ordinary and common meaning of the phrase "adjoining

4  shorelines" is that fringe of land at the edge of a large body of water, such as an

5  ocean, sea, lake, or river.

6      There is no suggestion in the referenced definitions of the words "shore,"

7  "shoreline," or "adjoining" that the phrase "adjoining shorelines" ordinarily or

8  naturally means, or is commonly used to refer to, ephemeral, unnamed "tributaries"

9  of unnamed "tributaries," or ephemeral creeks, like the so-called "Palmer Road

10 Creek," Cat Canyon Creek, or the so-called "Spring Canyon Tributary."  Such

11 surface features are ubiquitous on the land within the United States.  They are found

12 in virtually every field, meadow, hill, and mountain, as well as along most roads.

13 The land immediately adjoining such features is not ordinarily, commonly, or

14 naturally, if ever, referred to as the "adjoining shoreline" of those features.

15     Given the ordinary, common, and natural meaning of the phrase "adjoining

16 shorelines," which is unambiguous, there no need, nor would it be appropriate, to

17 resort to maxims of statutory construction such as *noscitur a sociis* and *ejusdem*

18 *generis* to alter its meaning.  *Donovan,* 666 F.2d at 327; *Russell Motor Car Co.*, 261

19 U.S. at 519.  Thus, as used in Section 1321(b)(3) and 40 C.F.R. § 110.3(b), the term

20 "adjoining shorelines" means that fringe of land at the edge of a large body of water,

21 such as an ocean, sea, lake, or river.

22     **(b)**    **The Legislative History of "Adjoining Shorelines"**

23     As set forth immediately below, there is nothing in the legislative history of

24 the phrase "adjoining shorelines" in Section 1321(b)(3) to suggest that Congress

25 intended the phrase to have a meaning other than its ordinary, common, and natural

26 meaning.

27

28

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

937297.03/SF

Case No.  CV 11-05097 FMO (RZx)
MEMORANDUM OF POINTS AND
AUTHORITIES

-11-

### (i)    Its Original Use (1966-1970)

The federal prohibition against the discharge of oil to "adjoining shorelines" first appeared in the Clean Water Restoration Act, Pub. Law No. 89-753, 80 Stat. 1246, 1253 (1966) (the "CWRA of 1966").  Section 211 of the CWRA of 1966 amended Section 3 of the Oil Pollution Act of 1924 (Pub. L. No. 288, 43 Stat. 604), to make it unlawful for "any person to discharge, or permit the discharge from any boat or vessel of oil by any method, means or manner into or upon the navigable waters of the United States, and *adjoining shorelines of the United States."*  80 Stat. at 1253 (emphasis added).  In 1966, Congress defined the term "navigable waters of the United States" to mean "all portions of the sea within the territorial jurisdiction of the United States, and all inland waters navigable in fact." *Id.*

There is nothing in the text of this statute or its legislative history to suggest that Congress, when it used the phrase "adjoining shorelines," intended that phrase to have a meaning other than its common, ordinary, and natural meaning.

### (ii)    Its Current Use (1970-Present)

In 1970, with its passage of the Water Quality Improvement Act of 1970 ("WQIA of 1970"), Pub. L. No. 91-224, 84 Stat. 91, Congress created the modern, comprehensive, federal statutory prohibition against the discharge of oil, now codified in Section 1321.  Specifically, Section 102 of the WQIA of 1970, 84 Stat. at 91-98, added new Sections 11 through 16 to the Federal Water Pollution Control Act ("FWPCA") to "deal[] solely with the control of pollution by oil." H.R. Rep. No. 91-940, at 37 (1970) (Conf. Rep.).  In language virtually identical to Section 1321(b)(3), the new Section 11(b)(2) of the FWPCA prohibited, "[t]he discharge of oil into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone in harmful quantities as determined

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

937297.03/SF

-12-

Case No.  CV 11-05097 FMO (RZx)
MEMORANDUM OF POINTS AND
AUTHORITIES

1  by the President...."  84 Stat. at 92.[5]  The phrase "adjoining shorelines" was not

2  defined, nor does the legislative history of the WQIA of 1970 address its meaning.

3       An August 7, 1969 Senate Report on the WQIA of 1970, explains, however,

4  that the purpose of the legislation was to prevent future oil spills into coastal waters

5  that had ruined *beaches* and threatened *shore waters*, two obvious features of land at

6  the edge of an ocean or sea.  S. Rep. No. 91-351, at 3 and 6 (1969).[6]  In his

7  conference report to the Senate, Senator Muskie, one of the sponsors of the bill, also

8  explained that it was the intention of the conferees that the undefined phrase

9  "navigable waters of the United States" be broadly construed to include "all water

10  bodies, such as lakes, streams, and rivers regarded as public navigable in law which

11  are navigable in fact" and all such waters that serve as a transportation link in the

12  chain of commerce.  116 Cong. Rec. 8983, 8985 (1970)[7]

13

14

---

15  [5]  In 1978, Congress amended the "in harmful quantities" language to read "in such quantities as may be harmful as determined by the President."  Pub. L. No. 95-

16  576, 92 Stat. 2467, 2468 (1978).
    [6]  Specifically, the relevant passage provides: "Frequent oil spills from vessels and

17  from on- and off-shore facilities have ruined *beaches* and lowered the quality of our rivers and *shore waters* and have jeopardized animal and vegetable life.  The

18  spills from the *Torrey Canyon* and the *Ocean Eagle* have been spectacular examples of this danger.... This legislation recognizes the greater need to protect

19  the public against disastrous oil spills such as the continuing oil leak off *the coast* of California at Santa Barbara.  Senate action in 1967 followed the *Torrey*

20  *Canyon* incident.... Since that time the *Ocean Eagle* which broke up on San Juan Harbor involved cleanup costs of approximately $700,000.... The committee

21  recognizes that fortunately there has been no discharge of oil from a vessel, affecting the coastal waters of the United States, which approaches the liabilities

22  imposed by this bill."  (Emphasis added.)
    [7]  The relevant passage provides:  "It is intended that the term include all water

23  bodies, such as lakes, streams, and rivers, regarded as public navigable waters in law which are navigable in fact. It is further intended that such waters shall be

24  considered to be navigable in fact when they form, in their ordinary condition by themselves or by uniting with other waters or other systems of transportation,

25  such as highways or railroads, a continuing highway over which commerce is or may be carried on with other States or with foreign countries in the customary

26  means of trade and travel in which commerce is conducted today.  In such cases the commerce on such waters would have a substantial economic effect on

27  interstate commerce."  Following his conference report, Senator Muskie asked for and received the unanimous consent of the Senate that his remarks, along

28  with the statement of the managers on the part of the House which had been placed in the record, "reflect the intent of the conference agreement." *Id.*

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

937297.03/SF

-13-

Case No. CV 11-05097 FMO (RZx)
MEMORANDUM OF POINTS AND
AUTHORITIES

1    Nothing in the legislative history of the WQIA of 1970 suggests that

2    Congress intended that the phrase "adjoining shorelines" should have a meaning

3    other than its ordinary, common, and natural meaning.

4         With passage of the FWPCA Amendments of 1972 (Pub. L. No. 92-500, 86

5    Stat. 816), Congress enacted what is now known as the modern Clean Water Act

6    ("CWA") with its two seminal provisions, Section 1311 and 1321.  Again, the

7    phrase "adjoining shorelines" was not defined.

8         Section 301 of the FWPCA Amendments of 1972, codified as Section 1311,

9    created today's comprehensive national pollution discharge elimination system

10   ("NPDES") which, with all its complexities, regulates the discharge of pollutants to

11   "navigable waters" by permit.[8]  Under the NPDES program, the "discharge of a

12   pollutant" is defined in Section 1362(7) as "the addition of any pollutant to

13   navigable waters from any point source."  Section 1362(7) ambiguously defines the

14   term "navigable waters" to mean "the waters of the United States, including the

15   territorial seas."  The new NPDES permit provisions in the CWA did not contain

16   any provision regulating the discharge of pollutants to "adjoining shorelines."

17        Section 311 of the FWPCA Amendments of 1972, now codified as Section

18   1321, reenacted without material change the oil discharge prohibition provisions

19   Congress adopted two years earlier as Section 11 of the FWPCA.  *Compare* Section

20   11 of the FWPCA (Pub. L. No. 910224, § 11, 84 Stat. 91, 91-98) with Section 311

21   of FWPCA Amendments of 1972 (Pub. L. No. 92-500, § 311, 86 Stat. 816, 844-

22   846).

23        The legislative history of Section 311 of the FWPCA Amendment of 1972

24   confirms that this was Congress' intent.[9]  On September 28, 1972, after the Senate

25

26   [8]  At the core of the NPDES permit program is Section 1311(a), which provides in
     a single sentence that: "[e]xcept as in compliance with this section and sections

27   1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any
     pollutant by any person shall be unlawful."

28   [9]  *See* S. Rep. No. 92-414, at 65-66 (1971) (explaining that under Senate Bill 2770
     the oil discharge prohibition in Section 11 of FWPCA, enacted in 1970, would be

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

937297.03/SF

-14-

Case No. CV 11-05097 FMO (RZx)
MEMORANDUM OF POINTS AND
AUTHORITIES

1  and the House passed different versions of the proposed amendments to the

2  FWPCA, the Senate's Conference Report recommended that both houses adopt the

3  Senate Bill, S. 2770, with minor modifications, explaining that the new Section 311

4  of the FWPCA would simply reenact existing law with one change: "*Senate bill*

5  Section 311 which deals with oil and hazardous substances liability is basically the

6  same as existing law.  The section is modified, however, to add liability for the

7  cleanup of any hazardous material discharged into navigable waters.... *House*

8  *amendment* Section 311 is basically the same as existing law with respect to oil

9  spills, but adds new provisions for hazardous substances."  S. Rep. No. 92-1236, at

10  132-133 (1972) (Conf. Rep.).  On this issue, the US agrees.[10]  Nor could it disagree.

11  It is a well settled rule of statutory construction that next to the statute itself, a

12  conference report is the most persuasive evidence of Congressional intent for

13  enacting a statute.[11]

14      Like the legislative history of the WQIA of 1970, the legislative history of

15  Section 311 of the FWPCA Amendments of 1972 contains no suggestion, let alone,

16

---

17  [10]  reenacted with the addition of a prohibition against the discharge of hazardous
substances); and H.R. Rep. No. 92-911, at 117 (1972) (explaining that the

18  proposed new "Section 311 ... closely follows existing section 11 [of the
FWPCA enacted in 1970] with respect to oil spills.  New provisions for

19  hazardous substances have been added").
[10]  On October 11, 1972, two weeks after the Senate's September 28 Conference

20  Report (92-1236) was published, U.S. EPA Administrator Ruckelshaus wrote, on
behalf of the U.S. EPA, a letter to the Office of Management recommending

21  presidential approval of the FWPCA Amendments of 1972 Act.  (U.S. EPA
Letter, October 11, 1972, *reprinted in* A Legislative History of the Water

22  Pollution Control Act Amendments of 1972, Vol. 1, at 143-158.)  In that letter,
US EPA confirmed its understanding that, with regard to oil discharge prohibition,

23  the FWPCA Amendments of 1972, that had passed the House and Senate, did not
change the existing law governing the discharge of oil: "[t]he existing law with

24  respect to pollution from oil discharges is generally continued.  Similar
provisions of regulation and enforcement as the imposition of financial liability

25  are extended to hazardous substances as well." *Id.*
[11]  *Demby .v Schweiker*, 671 F.2d 507, 510 (D.C. Cir. 1981) ("Because the

26  conference report represents the final statement of the terms agreed to by both
houses, next to the statute itself it is the most persuasive evidence of

27  congressional intent"); *Davis v. Lukhard*, 788 F.2d 973, 981 (4th Cir. 1986)
(Inasmuch as the conference report represents the final statement of terms agreed

28  upon by both houses of Congress, next to the statute itself, it is the most
persuasive evidence of Congressional intent behind the enactment of a statute").

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

937297.03/SF

Case No.  CV 11-05097 FMO (RZx)
MEMORANDUM OF POINTS AND
AUTHORITIES

-15-

1    a clear expression, that Congress intended the phrase "adjoining shorelines" to have

2    a meaning other than its ordinary, common, and natural meaning.  Nor is there

3    anything in its legislative history that suggests Congress intended the term

4    "adjoining shorelines," and thus the jurisdiction of the CWA, to include that fringe

5    of land immediately adjacent to the so-called "Palmer Road Creek," Cat Canyon

6    Creek, or the so-called "Spring Canyon Tributary," which the US admits, are not

7    surface features which have contained or could contain sufficient water (1) to render

8    them navigable in fact, (2) to be used in interstate or foreign commerce, or (3) to be

9    susceptible to use in interstate or foreign commerce.

10         It necessarily follows that the US cannot present admissible evidence that the

11    Seven Spills discharged oil upon "adjoining shorelines" within the meaning of

12    Section 1321(b)(3) and 40 C.F.R. § 110.3(b).  Accordingly, HVI-CC is entitled to a

13    partial judgment dismissing each of the allegations in the First Claim that the Seven

14    Spills discharged oil upon the "adjoining shorelines" of the so-called "Palmer Road

15    Creek," Cat Canyon Creek, and the so-called "Spring Canyon Tributary" in violation

16    of Section 3121(b)(3).

17           **III.    The Motion Directed at the Regional Board Claims**

18         **A.      Overview**

19         HVI-CC also seeks to narrow the issues for expert discovery and trial with

20    respect to the Sixth and Seventh Claims brought by the Regional Board.  With

21    regard to the Sixth Claim, HVI-CC seeks a partial judgment dismissing six of the 17

22    alleged spills at issue in the Sixth Claim on the ground that the Regional Board

23    cannot produce admissible evidence that those six spills discharged oil and produced

24    water into the "waters of the State," an essential element of the alleged violations of

25    California Water Code ("CWC") section 13350(a).[12]  With regard to the Seventh

26    Claim, HVI-CC seeks a judgment dismissing all claims for volume-based penalties

27

28    [12]    All references to "CWC Section ___ " in this Section III of this brief are to a
       section of the California Water Code, unless otherwise indicated.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

937297.03/SF

Case No. CV 11-05097 FMO (RZx)
MEMORANDUM OF POINTS AND
AUTHORITIES

-16-

1  for all eight spills at issue in the Seventh Claim on the ground that the Plaintiffs (the

2  US and the CDFW), which were responsible for overseeing the cleanup of each

3  spill, confirmed, shortly after each spill, in writing that no further cleanup was

4  required. Finally, HVI-CC seeks dismissal of the March 3, 2008, U-Cal spill from

5  the Seventh Claim based upon the Regional Board's admission that it does not

6  contend that the spill violated CWC Section 13385.

7       **B.**    **The Material Allegations in the FAC**

8       The Regional Board alleges that HVI-CC spilled crude oil and produced

9  water on 17 separate occasions at its oil production facilities located in Santa Maria,

10  California. (FAC ¶¶ 68-71, 76-82, 84, 90-99, 104-111, 116-124, 138-143.) Under

11  its Sixth Claim, the Regional Board seeks civil penalties for violation of CWC

12  Section 13350(a) with respect to each of the 17 alleged spills. (*Id.* ¶¶ 207-209.)

13  Under its Seventh Claim, the Regional Board seeks, in the alternative to its CWC

14  Section 13350 claim, civil penalties for violation of CWC Section 13385(a)(5) on

15  both a per diem and volumetric basis with respect to eight of the 17 alleged spills.

16  (*Id.* ¶¶ 210-212.)

17       **C.**    **The Undisputed Material Facts**

18       Six of the 17 alleged spills for which the Regional Board seeks a civil penalty

19  under CWC Section 13350(a), in its Sixth Claim, were dry and promptly cleaned up:

20  (1) June 8, 2007, Bradley 3-Island; (2) July 16, 2007, Bell; (3) December 27, 2008,

21  Bell; (4) May 1, 2009, Bell; (5) July 2, 2009, Bell; and (6) October 14, 2010, Bell

22  (the "Six 13350 Spills"). (SSUF ¶¶ 31-40.) Contemporaneous records generated by

23  one or more of the Plaintiffs and/or Santa Barbara County report that, at the time of

24  each of the Six 13350 Spills, the surface features impacted were dry and the spills

25  were promptly cleaned up. (*Id.*)

26       Under its Seventh Claim, the Regional Board seeks volume-based penalties

27  under CWC Section 13385(b)(1)(B) for eight alleged spills: (1) July 16, 2007, Bell;

28  (2) December 7, 2007, Bell; (3) January 5, 2008, Zaca/Davis; (4) January 29, 2008,

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

937297.03/SF

-17-

Case No.  CV 11-05097 FMO (RZx)
MEMORANDUM OF POINTS AND
AUTHORITIES

1    Bell; (5) December 27, 2008, Bell; (6) May 1, 2009, Bell; (7) October 14, 2010,

2    Bell; and (8) December 21, 2010, Bell (the "13385 Spills").[13]  (FAC ¶¶ 210-212.)

3    For each of the 13385 Spills, one of more of the Plaintiffs confirmed

4    contemporaneously that no further cleanup was required.  (SSUF ¶¶ 42, 44, 46-47,

5    49-50, 52, 54, 56, 58.)  Each cleanup confirmation was without qualification or

6    limitation.  (*Id.*)  Nor can the Regional Board produce any admissible evidence that

7    following each cleanup confirmation, any federal, state, or local agency requested,

8    required, or ordered HVI-CC to undertake any further cleanup activities.  (*Id.* ¶¶ 43,

9    45, 48, 51, 53, 55, 57, 59.)

10    **D.    Argument**

11         **1.    The Six 13350 Spills Should be Dismissed Because They Did**

12              **Not Involve a Discharge to "Surface Water or Groundwater"**

13         To establish a violation of CWC Section 13350(a), the Regional Board must

14    prove at trial that HVI-CC: (1) discharged; (2) waste; (3) to waters of the State.

15    CWC Section 13350(a) provides: "A person who … causes or permits any oil or any

16    residuary product of petroleum to be deposited in or on any of the ***waters of the***

17    ***state***, except in accordance with waste discharge requirements or other actions or

18    provisions of this division, shall be liable civilly, and remedies may be proposed…"

19    (Emphasis added.)  The term "waters of the state" is defined in CWC Section

20    13050(e) as "any ***surface water or groundwater***, including saline waters, within the

21    boundaries of the state."  (Emphasis added.)

22         There are no reported cases that discuss the scope or meaning of the term

23    "waters of the state" as defined in CWC Section 13050(e) as "any surface or

24

25    _____

26    [13]  In the FAC, the Regional Board claimed that March 3, 2008, U-Cal spill violated CWC Section 13385 (FAC ¶¶ 142, 211), however, in its responses to HVI-CC Requests for Admissions, the Regional Board admitted that the Regional Board does not contend that the March 3, 2008, U-Cal spill violated CWC Section 13385.  (SSUF ¶ 41.)  Thus, although not included in the list of "13385 Spills," HVI-CC nevertheless seeks its dismissal from the Seventh Claim consistent with the Regional Board's admission.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

937297.03/SF

-18-

Case No.  CV 11-05097 FMO (RZx)
MEMORANDUM OF POINTS AND
AUTHORITIES

1  groundwater." As noted in Section II.D.2, above, in the absence of a statutory

2  definition, courts construe statutory words and terms in accordance with their

3  ordinary, common, or natural meaning. *FDIC v. Meyer, supra,* 510 U.S. at 476, 114

4  S.Ct. 996, 127 L.Ed.2d 308; *Hunt v. Superior Court* (1999), 21 Cal.4th 984, 1000

5  (same). If there is no ambiguity in meaning of the words, courts should presume

6  that "the Legislature meant what it said," and go no further. *Hunt, supra,* 21 Cal.4th

7  at 1000.

8       Here, the meaning of the statutory words "water" and "groundwater" are

9  unambiguous. The plain meaning of "water" is "the liquid that descends from the

10 clouds as rain, forms streams, lakes, and seas...." Merriam-Webster's Collegiate

11 Dictionary (10th ed. 1999). The term "groundwater" means "water within the earth

12 that supplies wells and springs." *Id.* Thus, under the plain meaning of CWC

13 Section 13350(a)(3), waste discharged onto dry soil, or into a dry ephemeral

14 streambed, does not involve the deposit of waste into the "waters of the state."[14]

15      Here, it is undisputed that the Six 13350 Spills did not involve the discharge

16 of waste to surface water or groundwater because at the time of each of the Six

17 13350 Spills the surface features impacted were dry and the spills were promptly

18 cleaned up. (SSUF ¶¶ 31-40.) Accordingly, the Regional Board cannot produce

19 admissible evidence that any of the Six 13350 Spills involved a discharge charge in

20 violation of CWC Section 13350(a) and HVI-CC is entitled to a judgment

21 dismissing the Six 13350 Spills from the Regional Board's Sixth Claim.

22

23

24 [14]  CWC Section 13350(a)(3) makes only the act of "depositing" of oil into water
       punishable, not the mere threat of oil eventually reaching or affecting waters of
25     the state. By way of comparison, CWC Section 13304 makes actionable the
       discharge of waste that "creates, or threatens to create, a condition of pollution or
26     nuisance." Similar language regarding the "threat" of deposits into waters of the
       state is absent from CWC Section 13350. The conspicuous absence such
27     language demonstrates the Legislature's intent to punish only the actual
       depositing of oil into waters. Therefore, even if an oil spill onto dry soil could be
28     said to create a "threat" to waters of the state, it would not be actionable under
       CWC Section 13350.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

937297.03/SF

-19-

Case No. CV 11-05097 FMO (RZx)
MEMORANDUM OF POINTS AND
AUTHORITIES

1          **2.**      **The Regional Board's Volume-Based Penalty Claims in the**

2                   **Seventh Claim Should be Dismissed Because Each the**

3                   **Section 13385 Spills Was Cleaned Up**

4      Under its Seventh Claim, the Regional Board seeks for each of the Eight

5  Section 13385 Spills, in the alternative to its CWC Section 13350 claim,[15]

6  volumetric-based civil penalties under CWC Section 13385(b)(1)(B)).  (FAC

7  ¶¶ 210-212.)  CWC Section 13385(b)(1) provides:

8         Civil liability may be imposed by the superior court in an amount

9         not to exceed the sum of both of the following:

10            (A) Twenty-five thousand dollars ($25,000) for each day

11         in which the violation occurs.

12            (B) Where there is a discharge, any portion of which is not

13         susceptible to cleanup or is not cleaned up, and the volume

14         discharged but not cleaned up exceeds 1,000 gallons, an

15         additional liability not to exceed twenty-five dollars ($25)

16         multiplied by the number of gallons by which the volume

17         discharged ***but not cleaned up*** exceeds 1,000 gallons.

18  (Emphasis added.)  13385(b)(1)

19      On the face of the statute, volume-based penalties are recoverable ***only*** for

20  that portion of a spill that "is not susceptible to cleanup or is not cleaned up."  *Id.*

21  Here, it is undisputed that Plaintiffs US and/or CDFW confirmed, shortly after each

22  spill, without qualification or limitation, that no further cleanup was required.

23  (SSUF ¶¶ 42, 44, 46-47, 49-50, 52, 54, 56, 58.)  Given these facts, HVI-CC is

24

25

26  [15]  If the Regional Board recovers civil penalties for a specific spill under CWC
27  Section 13385 it is precluded from recovery civil penalties under CWC Section
    13350.  CWC Section 13385(g) ("Remedies under this section are in addition to
    and do not supersede or limit, any other remedies, civil or criminal, except that
28  no liability shall be recoverable under CWC Section .... 13350 for violations for
    which liability is recovered under this section.")

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

937297.03/SF

Case No.  CV 11-05097 FMO (RZx)
MEMORANDUM OF POINTS AND
AUTHORITIES

-20-

1  entitled to partial judgment dismissing each of the Regional Board's volume-based

2  claims from the Seventh Claim.

3      Indeed, the Regional Board is precluded in its opposition to this motion from

4  contradicting these facts under the doctrine of equitable estoppel.

5      The doctrine of equitable estoppel provides that "'[w]henever a party has, by

6  his own statement or conduct, intentionally and deliberately led another to believe a

7  particular thing true and to act upon such belief, he is not, in any litigation arising

8  out of such statement or conduct, permitted to contradict it.'"  *City of Long Beach v.*

9  *Mansell* (1970) 3 Cal.3d 462, 488-489, quoting Cal. Evid. Code § 623.  It also

10  applies to all parties in privity with the party who made the controlling

11  representation or promise relied upon by another party.  *Milton H. Greene Archives,*

12  *Inc. v. CMG Worldwide, Inc.,* 568 F.Supp.2d 1152, 1168-1169 (C.D. Cal. 2008)

13  ("'[T]he party who is to be estopped, ***or one in privity with that party***, must have

14  asserted a fact or claim, or made a promise, that another party relied on....'")

15  (emphasis in original), *quoting Maitland v. Univ. of Minnesota*, 43 F.3d 357, 363-64

16  (8th Cir. 1994).

17      When a party seeks equitable estoppel against a state agency, state law

18  applies.  *See Sawyer v. Sonoma County*, 719 F.2d 1001, 1006 n. 11 (9th Cir. 1983)

19  ("This court has applied state law on the estoppel question when the party to be

20  estoppel is a state government or a subdivision thereof.");  *Ruecker v. Sommer*, 567

21  F. Supp. 2d 1276, 1299 (D. Or. 2008) (same).  It is equally settled that State

22  agencies like the Regional Board can be bound by the doctrine in the same manner

23  as a private party.  "[T]he doctrine of equitable estoppel may be applied against the

24  government where justice and right require it," provided that "estoppel will not be

25  applied against the government if to do so would effectively nullify 'a strong rule of

26  policy, adopted for the benefit of the public....'".  *City of Long Beach v. Mansell,*

27  *supra,* 3 Cal.3d at 493 (citations omitted) (holding that tidelands residents had relied

28

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

937297.03/SF

-21-

Case No.  CV 11-05097 FMO (RZx)
MEMORANDUM OF POINTS AND
AUTHORITIES

1  to their detriment upon acts of city, and applying doctrine of equitable estoppel to

2  force city to execute agreements to transfer title of tidelands).

3      Finally, independent of the doctrine of equitable estoppel, under California

4  law, where a local or state agency is charged with administering a particular statute,

5  a party may justifiably rely upon the agency's representations in enforcing the

6  statute, even if the agency is mistaken. *See, e.g., Carter v. Smith Food King* (9th

7  Cir. 1985) 765 F.2d 916, 924 ("[W]hen a state agency charged with administering a

8  particular statute determines that an individual has the right to sue under that statute

9  and so informs him, the claimant may justifiably rely on the agency's representation,

10  even if the state agency is in error."); *Wunderlich v. State of California* (1967) 65

11  Cal.2d 777, 783 ("The crucial question is thus one of justified reliance. If the

12  agency makes a '"positive and material representation as to a condition presumably

13  within the knowledge of the government, and upon which ... the plaintiffs had a

14  right to rely'" the agency is deemed to have warranted such facts ... [Citation.]").

15      Here, the Regional Board is estopped in this litigation from contradicting the

16  contemporaneous written statements of its Co-Plaintiffs, CDFW and the US, that no

17  further cleanup was required. The Regional Board, which did not respond to any of

18  the spills, is in privity, as evidenced by this action, with CDFW and/or the US, the

19  agencies charged by law with overseeing the cleanup of the spills. *See* Cal. Gov

20  Code §§ 8670.4, *et seq.* (chief deputy director of CDFW shall be administrator

21  responsible for oil spill response); 40 C.F.R. §§ 300.110, *et seq.* (EPA representative

22  shall be chair of team responding to inland oil spills). CDFW and/or the US

23  confirmed for each of the 13385 Spills that the cleanup was complete. (SSUF ¶¶ 42,

24  44, 46-47, 49-50, 52, 54, 56, 58.) Given the actions of the agencies responsible for

25  overseeing the cleanups of the Eight 13385 Spills, coupled with the absence of any

26  contemporaneous objection by the Regional Board, HVI-CC was entitled to

27  justifiably rely upon these actions and justifiably assume that it need not undertake

28

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

937297.03/SF

-22-

Case No. CV 11-05097 FMO (RZx)
MEMORANDUM OF POINTS AND
AUTHORITIES

1   any further cleanup efforts to avoid volume-based penalties under CWC Section

2   13385(b)(1)(B).

3           Moreover, given the undisputed facts, application of the doctrine of equitable

4   estoppel to prevent the Regional Board from, in opposition to this motion,

5   contradicting its Co-Plaintiffs, does not nullify any rule or policy adopted for the

6   benefit of the public.  If the Regional Board were allowed to contradict its Co-

7   Plaintiffs in this litigation, multiple years after CDFW and/or the US confirmed that

8   no further cleanup was required, the authority of these agencies would be

9   fundamentally undermined and those responsible for the spills and their cleanup

10  would no longer have the finality provided by those agencies regarding their cleanup

11  actions.  Indeed, California law affirmatively provides that HVI-CC is entitled to

12  justifiably rely upon the statements of CDFW and the US.  *Carter, supra*; and

13  *Wunderlich, supra.*

14          Accordingly, HVI-CC is entitled to an order dismissing all claims for

15  volumetric penalties from the Regional Board's Seventh Claim in the FAC.

16                          **IV.    Conclusion**

17          For all the foregoing reasons, HVI-CC respectfully requests that this Court

18  enter partial judgment dismissing the Seven Spills from the First Claim brought by

19  the US, the Six 13350 Spills from the Sixth Claim brought by the Regional Board,

20  all volumetric penalties claims from the Seventh Claim brought by the Regional

21  Board, and the March 3, 2008, U-Cal spill from the Seventh Claim.

22  Dated:  September 5, 2014            ALLEN MATKINS LECK GAMBLE
                                        MALLORY & NATSIS LLP
23                                      JAMES L. MEEDER

24
                                        By:    */s/ James L. Meeder*
25                                              JAMES L. MEEDER
                                                Attorneys for Defendant
26                                              HVI CAT CANYON, INC., f/k/a
                                                GREKA OIL & GAS, INC.
27

28

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

937297.03/SF

-23-

Case No.  CV 11-05097 FMO (RZx)
MEMORANDUM OF POINTS AND
AUTHORITIES